**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| **LEVERN JACOBS, SR.,** ) | |
| 1110 Teresa Dr. ) | |
| Accokeek, MD 20607 ) | |
| ) | |
| **PLAINTIFF** ) | **Case No. _____** |
| ) | |
| **v.** ) | **Judge _____** |
| ) | |
| **LAWRENCE M. SMALL,** ) | **JURY TRIAL DEMANDED** |
| Secretary of the Smithsonian, ) | |
| 1000 Jefferson Drive, SW ) | |
| Washington, DC 20560 ) | |
| ) | |
| **DEFENDANT.** ) | |
| _____ ) | |

## COMPLAINT

**(Discrimination Based on Race and Retaliation for Protected EEO Activity)**

### I.      NATURE OF ACTION

1.      Plaintiff LeVern Jacobs, Sr., brings this action against Defendant Lawrence M. Small, Secretary of the Smithsonian, to recover equitable relief, compensatory damages, lost wages and reasonable attorney's fees and costs for discrimination based on race and protected activity (retaliation) under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, et seq.

### II.      PARTIES

2.      Plaintiff LeVern Jacobs, Sr. is a resident of 1110 Teresa Dr., Accokeek, Maryland 20607.

3.      Defendant Lawrence M. Small is the Secretary of the Smithsonian Institution ("Defendant"), 1000 Jefferson Drive, SW, Washington, DC, 20560, an independent agency of

the federal government. The Smithsonian includes the National Gallery of Art ("NGA"), in Washington, DC.

## III. JURISDICTION

4.      Title VII, 42 U.S.C. § 2000e-16(c) and §2000e-5 provide this Court with personal jurisdiction over Secretary Small as the head of the Smithsonian. Secretary Small and the Smithsonian are present in Washington, DC, maintain files in Washington, DC, and took actions relevant to this matter in Washington, DC.

5.      This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §1331.

## IV. VENUE

6.      Venue is proper in this Court pursuant to 28 U.S.C. §1391 and Section 706 of the Civil Rights Act, 42 U.S.C. § 2000e-5(f)(3), because the Smithsonian administers and maintains the relevant personnel records in Washington, DC. Moreover, all acts of discrimination and retaliation in this matter occurred at the National Gallery of Art ("NGA") in Washington, DC.

## V. EXHAUSTION

7.      LeVern Jacobs, Sr., properly exhausted his administrative remedies pursuant to 29 C.F.R. §1614.407(c). Defendant issued a Final Agency Decision which Mr. Jacobs received on September 20, 2004. Mr. Jacobs timely filed an appeal to the U.S. Equal Employment Opportunity Commission on October 20, 2004, which was denied on April 26, 2005.

## VI. STATEMENT OF FACTS

### Background

8.      Mr. Jacobs is a Pipe Fitter (plumber) and his race is black. He has worked at the NGA in the Administrative Facilities Management organization for approximately 16 years. Mr. Jacobs'

second-line supervisor (John Bixler, Assistant Operations Manager), and upper management, including the Operations Manager (David Gilson), the Deputy Chief of Facilities (Michael Giamber) and the Chief of Facilities (Kurt Sisson), were all Caucasian. Mr. Jacobs has always received good performance reviews and never complained of discrimination until he faced the issues giving rise to this Complaint.

### Disparate Treatment Regarding First Performance-Based Suspension

9.    In October 2002, Mr. Jacobs and his fellow NGA plumbers, Robert Lowery, James Phillips and Mark Teed (all of whom are Caucasian), were equally responsible for the condition of the NGA drinking fountains. The weekend of October 5-6, 2002, Mr. Lowery and Mr. Phillips were assigned preventive maintenance on the NGA drinking fountains. Preventive maintenance involves, among other things, checking the pressure of the water fountains to see if the fountains need fixing, and checking the fountain's water filters to assess whether they should be changed, cleaned or replaced.

10.    On October 8, 2002, Mr. Jacobs' immediate supervisor, Donald Young (race-black), assigned Mr. Jacobs preventive maintenance on the NGA drinking fountains, which were still not functioning properly, despite the preventive maintenance assignment given to Messrs. Lowery and Phillips the prior weekend. At some point thereafter (though the Defendant has never established the date), the Defendant received a museum visitor complaint regarding the drinking fountains. The complaint, on its face, indicates that the complaining visitor had filed two prior, written complaints about the drinking fountains, which were the responsibility of all the plumbers, not merely Mr. Jacobs. The visitor's prior complaints were ignored. Any problems with the drinking fountains apparently pre-existed Mr. Jacobs' October 8, 2002 preventive

maintenance assignment. The complaining visitor did not identify Mr. Jacobs in any way in his/her complaint.

11.     Mr. Jacobs' second-line supervisor, Mr. Bixler, learned of the visitor's complaint from Mr. Sisson. On October 28, 2002, Mr. Bixler assigned Messrs. Lowery and Teed to perform preventive maintenance on the drinking fountains. After October 28, 2002, Mr. Bixler and Mr. Giamber did not inspect the drinking fountains to see if Messrs. Lowery and Teed completed the October 28, 2002 preventive maintenance assignment. In fact, on October 28, 2002, Messrs. Lowery and Teed did not complete the preventive maintenance on the drinking fountains. As of at least November 16, 2002, the fountains were still not functioning properly.

12.     On November 15, 2002, Mr. Bixler – who has a tattoo of a Confederate flag on his arm – proposed to suspend Mr. Jacobs for five days for "careless performance of assigned duties" in connection with the drinking fountains.[2] Mr. Bixler proposed no discipline for Messrs. Lowery, Phillips and Teed, though the latter were equally responsible for the condition of the drinking fountains at the time of the  visitor complaint, and  though Messrs. Lowery and Teed were responsible for not fixing the fountains timely on or after October 28, 2002. Upon information and belief, no other employees were ever suspended because of a visitor complaint.

13.     Mr. Jacobs was denied his Due Process opportunity to respond to the November 15, 2002 proposal to suspend, though, upon information and belief, similarly-situated, non-black co-workers are give such opportunities. In particular, non-black co-workers are given flexibility in responding to  proposed disciplinary actions, which was denied to Mr. Jacobs. The suspension proposal identified a seven-day deadline to respond  from November 20, 2002, the date of  Mr. Jacobs' receipt of the proposal. Mr. Jacobs' wife was in a car accident and was in the hospital

---

[2] Mr. Jacobs was not careless in repairing the fountains on October 8, 2002 – he repaired some of the fountains before he was tasked with other, more pressing assignments.

shortly before the November 27, 2002 deadline. During the final days of November or the first week of December 2002, Mr. Jacobs (who was unrepresented by counsel at the time) personally requested from Mr. Giamber an extension of time to respond to the suspension. Despite knowing of Mr. Jacobs' circumstances and his wife's accident, Mr. Giamber immediately rejected Mr. Jacobs' request stating that Mr. Jacobs' "time [was] up" and that the Defendant had already made its decision to sustain the proposed suspension. Yet, the Defendant issued no decision regarding the suspension for approximately three weeks thereafter.

14.     On December 18, 2002, Mr. Giamber sustained the November 15, 2002 proposal related to the October 8, 2002 preventive maintenance assignment, suspending Mr. Jacobs for five days from January 7-11, 2003. In suspending Mr. Jacobs, the Defendant disparately treated Mr. Jacobs with the severity of the penalty, imposing on Mr. Jacobs far more severe discipline than that imposed (if any discipline was imposed at all) upon Mr. Jacobs' non-black colleagues for similar or worse incidents of "neglect of duty" or misconduct. The Defendant's Table of Penalties sets forth a penalty of a reprimand to a 5-day suspension for a first offense of "Negligent or careless performance of assigned duties." Yet, unlike non-blacks, Mr. Jacobs was immediately given the maximum penalty.

15.     Mr. Jacobs was denied the benefit of real progressive discipline. The Defendant treated Mr. Jacobs' suspension as progressive discipline after a prior suspension against Mr. Jacobs for "abandonment," when Mr. Jacobs left work briefly to move his car in summer 2002. The two suspensions, however, were wholly unrelated – one was for perceived misconduct ("abandonment") and the other for an alleged performance deficiency ("careless performance").

16.     Even in Mr. Jacobs' acts were found to represent repeated misconduct, he was still treated more harshly than similarly-situated, non-black co-workers. For example, Mr. Teed has

been caught repeatedly for neglect of duty (abandonment), along with drunkenness on duty. Yet, Mr. Teed has always received the least degree of discipline permitted under the Table of Penalties, and has benefited from progressive discipline – receiving, in this order: a warning, a reprimand, two three-day suspensions and another reprimand. Mr. Teed has never received a five-day suspension, like Mr. Jacobs in his first performance-based discipline. Similarly, in May 2004, Mr. Phillips was Absent Without Leave repeatedly, but was not disciplined at all.

17.    Aside from the condition of the drinking fountains in October 2002, non-black employees have carelessly performed or did not perform their duties on other occasions, without being disciplined like Mr. Jacobs. For example, on about November 5, 2002, Messrs. Teed and Lowery failed in their assignment to fix a steam regulator. The broken steam regulator could potentially have led to an explosion – far more harmful than several non-functioning drinking fountains. Yet, Messrs. Teed and Lowery were not disciplined. Mr. Jacobs ultimately fixed the steam regulator. As another example, on May 11, 2004, Robert Lowery was found several times sleeping while on duty and failing to perform his assignments, even while collecting overtime pay. Upon information and belief, Mr. Lowery's new supervisor, Larry Smith (race-black), wished to impose some discipline upon Mr. Lowery, but Mr. Bixler and Mr. Gilson rejected this recommendation. Likewise, on August 24, 2004, Mr. Lowery, Mr. Teed and Mike Casanto (a new, Caucasian plumber) were caught sitting idly outside, neglecting their duties during their shift when they should have been working. Yet, upon information and belief, these three non-black plumbers received only reprimands.

18.    The Defendant's only substantial discipline of a Caucasian employee for negligent performance relates to Edward Hanna, whom Mr. Bixler suspended several times and ultimately proposed to remove (successfully) in 2001. Mr. Hanna was not similarly-situated to Mr. Jacobs.

In particular, Mr. Hanna was not a plumber, but an Engineering Technician. Mr. Bixler was Mr. Hanna's direct supervisor – not Mr. Hanna's second-line supervisor, as Mr. Bixler was for Mr. Jacobs. Also, Mr. Hanna was not treated similarly to Mr. Jacobs. Unlike Mr. Jacobs, Mr. Bixler counseled Mr. Hanna multiple times about preventive maintenance and gave Mr. Hanna the opportunity to correct his performance before Mr. Bixler finally proposed Mr. Hanna's first suspension in May 1998 for "negligence in carrying out assigned duties." Like Messrs. Teed and Lowery's inability to fix the steam regulator, Mr. Hanna's error regarding operating steam valves (for which he received his 2000 suspension) "could have had serious consequences for the physical safety of the priceless art housed" at the NGA, as "well as for the comfort of staff and visitors," according to the decision letter suspending Mr. Hanna for 10 days. The incident concerning drinking fountains for which Mr. Jacobs was suspended was not similarly serious.

19.    Mr. Young, the black supervisor who immediately supervised Mr. Jacobs and who issued the October 8, 2002 assignment, did not support the proposal to suspend Mr. Jacobs. Upon information and belief, there were no other instances in which second-line supervisors proposed discipline against plumbers, unsupported by the first-line supervisor. The Defendant has never explained why Mr. Jacobs was disciplined in connection with the drinking fountains by Mr. Bixler, without Mr. Young's agreement or participation. Mr. Young's non-black subordinates were never disciplined without Mr. Young's prior knowledge and approval.

## Disparate Treatment Regarding Training

20.    Mr. Jacobs was denied benefits of employment which were given to his Caucasian colleagues. Specifically, in the facilities area of the NGA, supervisors devise training plans for their subordinates. In 2002-2003, Mr. Bixler and Mr. Giamber volunteered Messrs. Lowery and Phillips for plumbing codes, asbestos (EPA refresher course), and backflow prevention training,

but did not devise a similarly helpful training plan for Mr. Jacobs or discuss any type of relevant training with Mr. Jacobs.  Between 2002-2003, Mr. Jacobs was the senior plumber, and based upon Defendant's standard practice, he was entitled the best training opportunities by virtue of his tenure, which would have positioned him for leadership roles on the maintenance staff.

21.    Defendant alleged that Mr. Jacobs was not presented the opportunity to attend asbestos training because he was on light duty at the time of the training. However, Mr. Jacobs' Caucasian colleagues were  never denied training when they were on light duty. Moreover, Defendant never explained why Mr. Jacobs' light duty status should have prevented him from receiving training, inasmuch as he was working at the NGA and available for training during the relevant time period. In addition, though Mr. Jacobs was on light duty during a particular seminar, backflow prevention training, Mr. Jacobs was on full, active duty during all other training in question. Yet, he was not given the opportunity to attend the listed training sessions, like his similarly-situated Caucasian colleagues, Messrs. Lowery and Phillips.  Defendant also contended that Mr. Phillips was provided training because he was the plumbing leader, but this assertion is similarly-false. Mr. Phillips was not the lead during the period in question, 2002-2003.

**Protected Activity**

22.    Mr. Jacobs contacted Defendant's EEO office in January 2003 to initiate EEO counseling regarding the discriminatory suspension of December 18, 2002, and the plumbing training he was denied discriminatorily. In April 2003, Mr. Jacobs filed a formal EEO complaint regarding the discriminatorily denied training and the December 18, 2002 suspension. Mr. Jacobs amended his formal EEO complaint several times, including May 27, 2003 (adding the discriminatory and retaliatory suspension proposed March 21, 2003 -- see discussion below) and March 12, 2004

(regarding a discriminatory and retaliatory hostile working environment and terms/conditions of employment).

### Disparate Treatment Regarding Second Performance-Based Suspension

23.    On March 21, 2003, Mr. Gilson proposed a ten-day suspension for Mr. Jacobs, alleging "negligent performance of assigned duties," purportedly relating to a November 2, 2002 incident with the women's restrooms at the NGA. In the incident in question, the restrooms were temporarily closed when the toilets overflowed. Though NGA managers, Mr. Gilson and Mr. Bixler, were aware of this toilet incident in November 2002, Mr. Gilson did not propose this suspension until one week after NGA managers were interviewed (on March 14, 2003) regarding Mr. Jacobs' first, informal EEO complaint. Upon information and belief, no other employees received discipline so long after the incidents allegedly giving rise to such discipline.

24.    Defendant's stated reasons for proposing Mr. Jacobs' second performance-based suspension were that he failed to notify his direct supervisor when he put the toilets out of order as his shift was ending on November 2, 2002, and that he failed to enter the incident in a log book. However, Mr. Jacobs timely notified Housekeeping Supervisor Sylvia Dorsey of the toilet problem before he left for the day on November 2, 2002 – and indeed, stayed after his shift to work on the problem. The two supervisors directly involved, Ms. Dorsey (race-black) and Mr. Young, agree that Mr. Jacobs' response to the toilet incident was appropriate. Mr. Young also agreed that the suspension was racist and contrary to his recommendation to management in November 2002.

25.    Similarly-situated Caucasian plumbers who did not engage in protected EEO activity have never been disciplined for leaving matters unresolved at the end of the workday or for only notifying Housekeeping of pending problems when leaving at the end of their shifts. Though Mr.

Jacobs did not enter the end-of-shift toilet overflow incident in the log book, no other plumbers were ever disciplined for failing to enter events in the log book.

26.     Mr. Jacobs is aware of one or more occasions in which Messrs. Lowery and Teed (who have no prior, protected EEO activity, upon information and belief) turned off the water to drinking fountains at the NGA and left for the day without notifying any supervisor or manager or entering this information in the log book, but were not disciplined.

27.     On June 2, 2003, Mr. Sisson (the Deciding Official) sustained the March 21, 2003 proposal, imposing a seven-day suspension. Although Mr. Sisson characterized the suspension as progressive discipline, justifying the harsh penalty, this treatment was again unlike a similarly-situated Caucasian plumber, Mr. Teed, who (as discussed supra) was disciplined progressively and less harshly, with a warning, two reprimands and two three-day suspensions.

## **Non-Pecuniary Damages**

28.     The discrimination and retaliation Mr. Jacobs has endured have caused stress and depression, with symptoms including, at different times, diarrhea, weight loss, diminished appetite, constipation, loss of sleep and change in temperament. Mr. Jacobs' relationships with family members have been negatively impacted. In connection with the events surrounding this case, Mr. Jacobs had to begin seeing a psychologist. Among other treatments, Mr. Jacobs has been prescribed Ambien (sleep medication) and Paxil (psychotropic anti-depressant) to assist with the symptoms.

## **VII. FIRST CAUSE OF ACTION**

### **Discriminatory Suspension in Violation of Title VII, 42 USC §2000e-2(a)**

29.     Mr. Jacobs adopts and incorporates by reference paragraphs 1 through 28 above.

30.     Mr. Jacobs' race is black.

31.     Smithsonian managers, including but not limited to Messrs. Bixler, Gilson, Giamber and Sisson (all race-Caucasian), were aware of Mr. Jacobs' race in 2002 and since that time.

32.     Title VII, 42 USC §2000e-2(a)(1) makes it an unlawful employment practice for the Smithsonian to discriminate against Mr. Jacobs with respect to his compensation, terms, conditions, or privileges of employment – which includes with respect to discipline – because of his race.

33.     On December 18, 2002, Defendant issued a five-day suspension of Mr. Jacobs, for actions which did not warrant a suspension. Defendant did not discipline with equal severity or at all similarly-situated, non-black co-workers who engaged in behaviors similar to those for which Mr. Jacobs was suspended.

34.     Defendant cannot articulate a legitimate, non-discriminatory reason for its December 18, 2002 suspension of Mr. Jacobs.

35.     Even if the Defendant articulated legitimate, non-discriminatory reasons for its December 18, 2002 suspension of Mr. Jacobs, such explanations would be merely pretext for race discrimination.

36.     Defendant's discriminatory December 18, 2002 suspension violated 42 USC §2000e-2(a)(1), because it was based upon his race-black.

37.     The Defendant's violation of Title VII on December 18, 2002 directly and proximately caused Mr. Jacobs the following general and specific damages, among others: denied pay, benefits and entitlements; injury to reputation; stunted career development; personal humiliation; strained family relationships; severe and extreme emotional and mental distress; physical illness; and medical expenses incurred in redressing the aforementioned emotional, mental and physical distress.

## VIII. SECOND CAUSE OF ACTION

### Discriminatory/Retaliatory Suspension in Violation of Title VII, 42 USC §§2000e-2(a) and 3(a)

38.    Mr. Jacobs adopts and incorporates by reference paragraphs 1 through 37, above.

39.    During and after January 2003, Mr. Jacobs engaged in protected EEO activity, including but not limited to activity on January 22, 2003, February 13, 2003 and April 15, 2003.

40.    Title VII, 42 U.S.C. §2000e-3(a), prohibits the Smithsonian from retaliating "against any of [its] employees …because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."

41.    Smithsonian managers, including but not limited to Messrs. Bixler, Gilson, Giamber and Sisson, were aware of Mr. Jacobs' protected EEO activities.

42.    On June 2, 2003, Defendant issued a seven-day suspension of Mr. Jacobs, for actions which did not warrant a suspension. Defendant did not discipline with equal severity similarly-situated, non-black co-workers who did not engage in prior EEO activity, although such co-workers did engage in behaviors similar to those for which Mr. Jacobs was suspended.

43.    Defendant cannot articulate a legitimate, non-discriminatory reason for its June 2, 2003 suspension of Mr. Jacobs.

44.    Even if the Defendant articulated legitimate, non-discriminatory reasons for its June 2, 2003 suspension of Mr. Jacobs, such explanations would be merely pretext for race discrimination and EEO retaliation.

45.    Defendant's discriminatory June 2, 2003 suspension violated 42 USC §§2000e-2(a) and 3(a), because it was based upon Mr. Jacobs' race-black and his prior EEO activity.

46.    The Defendant's violation of Title VII on June 2, 2003 directly and proximately caused Mr. Jacobs the following general and specific damages, among others: denied pay, benefits and

entitlements; injury to reputation; stunted career development; personal humiliation; strained family relationships; severe and extreme emotional and mental distress; physical illness; and medical expenses incurred in redressing the aforementioned emotional, mental and physical distress.

## IX. THIRD CAUSE OF ACTION

## Discrimination in Training in Violation of Title VII, 42 U.S.C. §§2000e-2(d) and 3(a)

47.    Mr. Jacobs adopts and incorporates by reference paragraphs 1 through 46 above.

48.    Title VII, 42 U.S.C. §2000e-2(d) and 3(a), prohibits race discrimination and EEO-based retaliation in on-the-job training.

49.    In 2002-2003, Mr. Jacobs was not provided with useful training opportunities like similarly-situated white co-workers who did not complaint of discrimination.

50.    Defendant cannot articulate a legitimate, non-discriminatory reason for denying Mr. Jacobs training.

51.    Even if the Defendant articulated legitimate, non-discriminatory reasons for denying Mr. Jacobs training, such explanations would be merely pretext for race discrimination and EEO retaliation.

52.    Defendant's discriminatory denial of training violated 42 U.S.C. §§2000e-2(d) and 3(a) because it was based upon Mr. Jacobs' race-black and his prior EEO activity.

53.    The Defendant's violation of Title VII with respect to training directly and proximately caused Mr. Jacobs the following general and specific damages, among others: denied benefits and entitlements; injury to reputation; stunted career development; personal humiliation; strained family relationships; severe and extreme emotional and mental distress; physical illness; and

medical expenses incurred in redressing the aforementioned emotional, mental and physical distress.

## X. RELIEF REQUESTED

WHEREFORE, Plaintiff LeVern Jacobs, Sr., requests judgment against Lawrence M. Small, Secretary of the Smithsonian, as follows:

A.      Rescission of Mr. Jacobs' two suspensions, dated December 18, 2002 and June 2, 2003, with full back pay and interest;

B.      Compensatory damages (both past and future  pecuniary damages and past and future non-pecuniary damages) in an amount to be proven at trial;

C.      Appropriate plumbing training for Mr. Jacobs such as that provided to similarly-situated, non-black plumbers;

D.      Performance awards for Mr. Jacobs such as those provided to similarly-situated, non-black plumbers;

E.      Back pay with interest, for any and all of the time Mr. Jacobs had to take off as leave or LWOP when he was suffering from emotional distress related to the incidents involved in this case;

F.      Reasonable attorneys' fees and costs;

G.      Injunctive relief including a clean record for Mr. Jacobs (i.e., not limited to rescission of the suspensions) and posting of notices; and

H.      Such other relief as the Court may deem just and proper.

## XI. JURY DEMAND

Plaintiff LeVern Jacobs, Sr. demands a jury trial.

Respectfully submitted,

June _____, 2005                              _____
                                                Bryan J. Schwartz
                                                D.C. Bar No. 482960


                                                _____
                                                James M. Eisenmann
                                                D.C. Bar No. 435456

                                                PASSMAN & KAPLAN, P.C.
                                                1090 Vermont Avenue, N.W.
                                                Suite 500
                                                Washington, D.C.  20005
                                                TEL:   (202) 789-0100
                                                FAX:   (202) 789-0101

                                                Attorneys for the Plaintiff

## XII. VERIFICATION

LEVERN JACOBS, SR. hereby declares under the penalty of perjury that he is the PLAINTIFF

named in this COMPLAINT; he has read the foregoing COMPLAINT in its entirety and knows the

contents thereof; the same is true of his knowledge, except for those matters alleged on information

and belief, and as to those, he believes them to be true and correct.


June __, 2005                                    _____
                                                 LeVern Jacobs, Sr.